UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PAULO SERODIO, | : |
| Plaintiff, | : Civil Action No. 09-2221 (SRC) |
| v. | : OPINION |
| RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY, et al., | : |
| Defendants. | : |

**CHESLER**, District Judge

      This matter comes before the Court upon the motion for summary judgment filed by Defendant Rutgers, The State University of New Jersey (f/k/a University of Medicine and Dentistry of New Jersey ("UMNDJ"))[1] and the various individual Defendants,[2] who are affiliated with UMDNJ. Plaintiff Paulo Serodio ("Plaintiff" or "Serodio") has opposed the motion. The Court has considered the papers filed by the parties. It rules based on the written submissions and without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the reasons expressed below, the motion for summary judgment will be granted in its entirety.

---

[1] At all times relevant to this lawsuit, the Defendant academic institution was UMDNJ. The Court will therefore refer to Defendant as UMDNJ. As Defendants' papers note, however, UMDNJ merged with Rutgers University on July 1, 2013, prompting Defendants to substitute Rutgers as the named defendant.

[2] The individuals named as Defendants are as follows: Robert L. Johnson, M.D., Thomas Cohen, M.D., Kathy Ann Duncan, M.D., Linda Boyd, D.O., Julie Ferguson, M.B.A., Catherine Bolder, Lisa Pompeo, M.D., Denise V. Rodgers, M.D. and Marjorie Brandriss, Ph.D. Together with Defendant UMDNJ, the individual Defendants will collectively be referred to as "Defendants."

1

**I.    BACKGROUND**

This action arises out of Plaintiff's suspension from UMDNJ's medical school, in which he was enrolled as a student at all relevant times. Disciplinary proceedings were initiated against Serodio in January 2007. In April 2007, following a hearing in which he participated, Serodio was found to have violated the school's policies on proper use of its electronic information systems and its code of professional conduct. The disciplinary committee imposed a one-year suspension. Serodio appealed the decision, but it was affirmed in June 2007. After he was reinstated, Serodio experienced significant academic failures, resulting in his ultimate dismissal from the school in 2011.

Serodio filed this lawsuit in 2009 alleging that the disciplinary actions taken against him by UMDNJ and the other Defendants constituted retaliation for his exercise of First Amendment rights to free speech and discrimination on the basis of his race and national origin. Serodio is a white man who was born in Mozambique and therefore describes himself as a "white African American." He claims that UMDNJ's allegedly wrongful conduct stems from comments he made during class discussions in which he identified himself as a white African American and the similarly-themed essay he published in the school newspaper, The Plexus, in December 2006. The record also contains evidence that, in January 2007, Serodio posted lecture summaries known as "scribe notes" on the school's intranet system, for the purpose of sharing the notes with classmates, and that the notes contained inflammatory comments as well as lewd and inappropriate material. The Court's October 1, 2013 Opinion granting Defendants' motion for partial summary judgment narrates in more detail the facts relevant to both the claims and defenses, and the Court incorporates that Opinion's factual background section by reference.

In the October 1, 2013 Opinion and Order, the Court held that as a matter of law, Plaintiff could not establish his claims insofar as the alleged retaliatory and discriminatory conduct consisted of his dismissal from the medical school in 2011. Defendants had moved for partial summary judgment, seeking an order limiting the claims in the case to any nominal damage Serodio may have sustained as a result of the one-year suspension imposed in 2007. The Court found that the evidence demonstrated that Plaintiff's inadequate academic performance resulted in his dismissal and therefore no reasonable juror could find a causal link between Serodio's allegations of wrongdoing by Defendants and the alleged harm inflicted by the dismissal. (See d.e. 82 at 9-11.) Now, Defendants have moved for summary judgment on the entirety of the Amended Complaint, arguing that as to the pared-down action arising out of the allegedly retaliatory and discriminatory suspension, there is no genuine issue of fact a jury could resolve in Plaintiff's favor.

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court "must

view the evidence 'in the light most favorable to the opposing party.'" Tolan v. Cotton, 134 S.Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). It may not make credibility determinations or engage in any weighing of the evidence. Anderson, 477 U.S. at 255.

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'- that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact. Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001). However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial. Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990)

(holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment." ).

### III. DISCUSSION

The multi-count Amended Complaint pleads for relief under a number of federal civil rights statutes and parallel state law claims.[3] The claims can be grouped into three categories: the retaliation claims, the discrimination claims and the hostile work environment claims. Each category will be addressed in turn.

#### A. Retaliation Claims

In Count One of the Amended Complaint, Serodio seeks relief for Defendants' alleged violation of his First Amendment rights pursuant to 42 U.S.C. § 1983, which provides a private cause of action against a state actor for violation of rights created by federal statute or by the Constitution. 42 U.S.C. § 1983; Gonzaga University v. Doe, 536 U.S. 273, 289 (2002). Plaintiff claims that Defendants violated his civil rights by suspending him in retaliation for engaging in speech protected by the First Amendment. The Amended Complaint recites a number of instances preceding Serodio's suspension, in which Serodio expressed his views on race and national origin, including his in-class comments, his article in the student newspaper and an email he circulated to the student body in late December 2006. It does not specify which of Plaintiff's actions constitutes the allegedly protected conduct motivating adverse action against him. Perhaps due to this lack of precision, Defendants' argument in their moving brief focuses

---

[3] The Amended Complaint is organized into 12 counts. However, the Court notes that Counts Two, Six and Nine are all devoid of content and, per the Amended Complaint, "omitted without prejudice." The counts are respectively labeled as claims for violation of due process pursuant to 42 U.S.C. § 1983, for some unspecified violation pursuant to 42 U.S.C. § 1983 and for common law negligence. Plaintiff has not sought in the course of this litigation to amend the complaint to pursue such claims, and the Court accordingly deems them abandoned.

on Serodio's scribe notes.  The opposition brief to the instant motion for summary judgment, however, helps to clarify the matter.  In it, Plaintiff emphasizes that the "conduct at issue for which Dr. Serodio suffered irreparable harm and was ultimately suspended was his decision to write and publish an essay in the student newspaper, "The Plexus", on his opinion as to his self-identification as a 'White African American.'" (Opp'n Br. at 5.)

To establish a claim of First Amendment retaliation, a plaintiff must prove "(1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).  To demonstrate that protected speech was a substantial or motivating factor for an alleged retaliatory action, a plaintiff may rely on "a range of circumstantial evidence" including temporal proximity between the speech and adverse action, evidence of retaliatory animus in the intervening period, proof of ongoing antagonism and inconsistent explanations for the alleged retaliation. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2000); Ivan v. County of Middlesex, 595 F. Supp. 2d 425, 472 (D.N.J. 2009).

Plaintiff concedes that an article published in a school-sponsored newspaper, such as Serodio's December 2006 essay in The Plexus, constitutes "speech occurring in a non-public forum [and thus] may be subject to reasonable restrictions." Tinker v. Des Moines Independent Cmty. Sch. Dist., 393 U.S. 503, 508 (1969).  Even so, he argues that the record contains enough evidence to permit a finding that the essay was protected speech because the essay expressed a student's viewpoint on the topic of ethnicity and in no way frustrated the goals of UMDNJ. Defendants, in response, argue that regardless of whether the essay benefits from First Amendment protection, summary judgment on the claim is warranted because the evidence of

6

record gives rise to no genuine issue of fact regarding the motivation for the suspension against Serodio. They are correct.

Serodio attempts to create an issue as to Defendants' motivation by submitting a declaration in which Serodio asserts that Dr. Cohen, Dean of Student Affairs, told him that if he published the essay defending his self-identification as a "White African American" his "life and career would suffer irreparably." (Serodio Decl., ¶ 5.) He argues that Defendants' retaliatory animus for the suspension is evident from the fact that after the essay was published, the very outcome that Dr. Cohen had warned about occurred and was, moreover, set in motion by Dr. Cohen's own January 19, 2007 letter requesting that disciplinary proceedings be initiated. The main problem with Serodio's argument is that it blurs, if not wholly ignores the time period between his publication of the essay in the December 2006 issue of The Plexus and the disciplinary proceedings. He makes a leap from the purported conversation with Dr. Cohen about the essay and his suspension, without addressing significant intervening events directly related to the disciplinary charges brought against Serodio. The Court will review those undisputed facts in the record.

Shortly after publication of the essay, Serodio sent an email, dated December 27, 2006, to the entire student body to promote a talk he planned to give, in conjunction with the Student National Medical Association, on the topic of diversity. The email stated: "Following the talk, there will be a master ceremony: I'll be hung from a tree in front of the Sheraton Hotel, by none other than a Lynch Mob of people that disagree . . . . If [I] survive, will be lynched later in the hospital." (Soto-Greene Decl., Ex. C.) On January 4, 2007, Dr. Cohen wrote to Serodio noting that he had committed several infractions of the medical school's rules and policies, including

7

misuse of the UMDNJ intranet and failure to conform to the school's code of professional conduct.  The letter informed Serodio that "as an immediate result of your behavior, you are expected to participate in UMDNJ diversity training" and recommended he seek counseling.  (Id., Ex. D.)  Additionally, Dr. Cohen warned in that letter that "any future conduct which fails to demonstrate regard for professional standards of behavior, including interactions and communications with fellow students, staff or patients may subject you to disciplinary action."  (Id.)  Days later, another student, who belonged to the Student National Medical Association, filed a written complaint with UMDNJ against Serodio regarding the "lynch mob" email and other behavior by Serodio.

      Against this backdrop stands the elephant in the room: Serodio's posting of scribe notes on Catalyst, a student-run UMDNJ website on which students, designated as "scribes" for a lecture, would summarize and share their notes with classmates. On or about January 12, 2007, Serodio prepared the scribe notes for a lecture on "Maternal Adaptations to Pregnancy" given by Dr. Lisa Pompeo in an Obstetrics and Gynecology course.  Consistent with school practice, Serodio submitted the draft notes to Dr. Pompeo for her review and approval.  After Dr. Pompeo returned a revised draft to Serodio, he posted the notes on Catalyst.  Serodio does not deny that the notes he posted contained material that was not included in the draft reviewed by Dr. Pompeo and that each page of the notes nevertheless bore a header indicating that they had been approved by Dr. Pompeo.  He states, however, that the added material was a "failed attempt at levity with pictures, cartoons and commentary" and denies that any of it was sexually explicit or racially charged. (Serodio Decl., ¶ 6.)  Despite Serodio's self-serving assertions, Defendants proffer evidence of the posted scribe notes which included unapproved material, in particular: a picture

of a pregnant woman participating in a bikini contest for "lactating lovelies" with a caption reading, in part, "show me your tits;" a picture of a pregnant woman playing golf; and a picture of a man and woman carrying wood.  (Soto-Greene Decl., Ex. G.)

The record demonstrates that it was this conduct which prompted Dr. Cohen to write to Dean Johnson and request that the school initiate a formal disciplinary proceeding against Serodio.  Dr. Cohen's January 19, 2007 letter to Dean Johnson specifically based the request on Serodio's Maternal Adaptations to Pregnancy scribe notes, which Dr. Cohen described as containing "offensive" material and violating "professional standards of behavior."  (Id.)  The letter also referenced the written complaint filed by another student regarding Serodio's December 27, 2006 email.  Additionally, students complained about the scribe notes, and Dr. Pompeo filed a professionalism complaint against Serodio.

The record also demonstrates that Serodio continued to engage in the same type of misconduct, that is, misuse of the UMDNJ intranet and unprofessional behavior. A further infraction involved a second set of inappropriate scribe notes prepared by Serodio for a lecture given by Dr. Brezenoff on "Anxiolytics, Sedatives, Hypnotics."  Though Serodio had been advised by the Catalyst student moderator that there had been complaints about his January 12, 2007 scribe notes and though Serodio, in response, assured the moderator that he would "stick to the lecture materials" (Soto-Greene Decl., Ex. I), Serodio nevertheless posted scribe notes on January 29, 2007 which included extraneous pictures, cartoons and commentary.  Among other materials, the scribe notes contained an image of a Time magazine cover of Justice Clarence Thomas with accompanying text regarding Anita Hill's testimony that Justice Thomas had asked about pubic hair in his drink.  On February 2, 2007, Dr. Cohen supplemented his request for

disciplinary action to add the posting of these scribe notes as well as Dr. Pompeo's February 1, 2007 professionalism complaint against Serodio.

The ensuing hearing focused on Serodio's infractions of the email policy and on his violation of the school's professionalism standards, as published in the Student Rights, Responsibilities and Disciplinary Procedures handbook as well as the New Jersey Medical School Code of Professional Conduct. Serodio in fact admitted that his behavior with regard to the scribe notes on Dr. Pompeo's lecture had been unprofessional and that he should not have used the school's intranet to write the "lynching" email. During the disciplinary hearing, Dr. Cohen stated that he did not request disciplinary action because of Serodio's article in The Plexus. He testified that he pursued the action because of the Obstetrics and Gynecology scribe notes and the student complaint about his behavior.

Nothing in the record suggests that Serodio's article in The Plexus prompted the discipline he claims was retaliatory. To the contrary, it shows that no action was taken against him in response to the December 2006 publication. Nor was any discipline pursued against him in early January 2007, when Dr. Cohen sent Serodio a letter advising that his misuse of the school's email system to circulate inflammatory messages about race and lynching could be a basis for sanctions, asking that he refrain from further misconduct and recommending that he seek counseling. It was only when Serodio, days after receiving this warning, posted the Maternal Adaptations to Pregnancy scribe notes to the school's intranet, adding the above-described material not approved by Dr. Pompeo, that Dr. Cohen decided to make a formal request for disciplinary proceedings. The evidence does not point to ongoing antagonism against Serodio following his December 2006 essay; rather, it shows several instances of misconduct by

Serodio, leading ultimately to the suspension. In light of the timing of events, the consistency of Defendants' explanation for the action taken against Serodio, and the overwhelming evidence that Serodio's suspension was imposed for his violations of the school's internet policies and code of conduct, no reasonable juror could find that Serodio's December 2006 essay, which he identifies as the "protected speech," was a substantial motivating factor for the suspension.

Accordingly, summary judgment on the First Amendment retaliation claim will be granted in favor of Defendants.

For the same reasons, Plaintiff's effort to seek recourse for the alleged retaliation pursuant to the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1, et seq., does not survive this motion for summary judgment. The NJLAD prohibits discrimination and retaliation against a person for opposing a practice because of race, color, religion, sex, or national origin. N.J.S.A. § 10:5-12d. Count Twelve of the Amended Complaint alleges that Defendants "violated the NJLAD when they retaliated against Plaintiff for making complaints about discrimination." (Am. Compl., ¶ 99.)

Much like the First Amendment retaliation claim, Count Twelve's claim of retaliation makes a conclusory assertion about Serodio's "complaints about discrimination" without specifying which of his comments allegedly motivated the suspension. Again, however, Plaintiff's brief in opposition to the motion focuses solely on his December 2006 article in The Plexus as the protected conduct. And much like the First Amendment retaliation claim, a prima facie NJLAD claim of discriminatory retaliation requires a plaintiff to establish: (1) that he engaged in a protected activity known by the defendant; (2) that the defendant thereafter retaliated against the plaintiff; and (3) that the plaintiff's participation in the protected activity

11

caused the retaliation. Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995). Assuming the article in The Plexus, or any other complaints about racial discrimination at UMDNJ, constitute protected activity under the NJLAD–and Plaintiff makes no effort in the opposition brief to address this element of the claim–the foregoing analysis pertaining to the First Amendment retaliation claim makes clear that no issue of fact exists as to the cause of the allegedly retaliatory action. Plaintiff does not adduce evidence upon which a reasonable jury could conclude that he was suspended, not for his scribe notes and the other misconduct explored at the disciplinary hearing, but for his "complaints about discrimination." As such, his NJLAD claim for retaliation cannot withstand this motion for summary judgment.

### B. Discrimination Claims

The Amended Complaint sets forth several claims predicated on allegations that Defendants subjected Serodio to unlawful discrimination on the basis of his race and national origin. In Count Three, Serodio alleges that Defendants violated his Fourteenth Amendment right to equal protection and seeks relief pursuant to § 1983. In Count Four, he claims that Defendants entered into a contract with Serodio entitling him to attend the medical school and breached that contract in an act of intentional, race-based discrimination in violation of 42 U.S.C. § 1981. Count Five asserts a claim under the NJLAD. Finally, Count Seven alleges that he was the victim of intentional discrimination in violation of 42 U.S.C. § 2000d-Title VI. Because of the similarity of elements required to prove each of these discrimination claims, the Court will begin its review with the Title VI claim and then apply its analysis as appropriate to the other claims.

Title VI of the Civil Rights Act prohibits intentional discrimination in connection with any program or activity receiving federal financial assistance. 42 U.S.C. § 2000d; Alexander v. Sandoval, 532 U.S. 275, 282–83 (2001).  The framework established by the Supreme Court in McDonnell Douglas Corporation v. Green for obtaining relief for employment discrimination pursuant to Title VII of the Civil Rights Act applies to Title VI cases.  Manning v. Temple Univ., No. 03-4012, 2004 WL 3019230, at *5 (E.D. Pa. Dec. 30, 2004) (observing that the McDonnell Douglas analysis "has been adapted for the educational context"); see generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) (setting forth burden shifting analysis applicable to Title VI claims). Thus, to prevail on a Title VI racial discrimination claim, a plaintiff must demonstrate that (1) he is a member of a protected class; (2) he suffered an adverse action by the defendants in his education; (3) despite being otherwise qualified; and (4) he was treated differently than similarly situated students who were not members of the protected class. Releford v. Pa. State Univ., No. 10-1621, 2011 WL 900946, at *5 (M.D. Pa. Mar. 14, 2011).

Without expressing any opinion as to the other essential elements, the Court concludes that the Title VI claim fails as a matter of law for the absolute absence of evidence that Serodio was treated differently than similarly situated students who were not "white African American" (to assume for the sake of argument that this would be recognized as a protected class) or simply not "African American."  He has failed to identify any similarly situated student at all—that is, one who violated UMDNJ Policy on the use of university electronic information systems, in particular, as Serodio does not dispute that he did, by posting scribe notes containing inappropriate material, not once but twice.  Moreover, even if he had proffered evidence of such a similarly situated individual, the record is devoid of evidence that Defendants imposed lesser

13

or no discipline on such a student for the same or similar offenses as those committed by Serodio. Cf. San Filippo v. Bongiovanni, 30 F.3d 424, 444 (3d Cir. 1994), abrogated on other grounds by Borough of Duryea v. Guarnieri, 131 S. Ct. 2488 (2011) (holding that the district court erred in granting the public university defendant summary judgment on the plaintiff's claim that he was dismissed from his position as a tenured professor in retaliation for engaging in protected First Amendment activities, reasoning that evidence in the record that "other faculty members committed infractions of comparable seriousness yet went unpunished" could permit a reasonable factfinder to conclude that the plaintiff's protected conduct was a substantial factor motivating his dismissal).

Plaintiff's failure to come forward with such evidence also defeats his § 1983 equal protection claim, § 1981 claim and NJLAD claim for discrimination. Each of these claims places a burden on Plaintiff to prove that he was treated differently than a similarly situated person who is not a member of the protected class to which Plaintiff belongs, or in this case, alleges to belong. Releford, 2011 WL 900946 at *11-12 (holding that analysis of equal protection claim employs McDonnell Douglas and Title VI burden shifting framework and that § 1981 claim involves the same elements as those required to prevail on a Title VI claim for racial discrimination); Chisolm v. McManimon, 97 F. Supp. 2d 615, 621 (2000) (noting that courts interpret the NJLAD by reliance on analogous federal statutes and caselaw and specifically observing that NJLAD employment discrimination cases generally apply a Title VII analysis).

Accordingly, the Court will grant summary judgment in favor of Defendants on all the claims asserted at Counts Three, Four, Five and Seven of the Amended Complaint.

### C. Hostile Environment

The Amended Complaint alleges that UMDNJ's conduct created a hostile environment against Plaintiff in violation of Title VI and of the NJLAD (Counts Eight and Eleven, respectively). Courts generally analyze NJLAD claims by reference to the analogous federal antidiscrimination statute and based on the guidance of federal court decisions interpreting and applying the analogous statute. Chisolm, 97 F. Supp. at 621. Thus the Court will address both of Plaintiff's hostile environment claims under the Title VI framework.

Pursuant to Title VI, a student may recover damages for a school's failure to address a racially hostile environment. Whitfield v. Notre Dame Middle Sch., 412 F. App'x 517, 521 (3d Cir. 2011) (citing Alexander v. Sandoval, 532 U.S. 275, 282-83 (2001)). To prevail on this claim, a plaintiff must establish that the school has acted with "deliberate indifference" to known acts of "severe, pervasive and objectively offensive student-on-student harassment." Id. (quoting Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999)). "[A] school may only be held liable for a Title VI claim of student-on-student racial discrimination when the school's response is 'clearly unreasonable in light of the known circumstances.'" Id. (quoting Davis, 526 U.S. at 648).

Plaintiff bases his hostile environment claims on allegations that, following the classroom discussion and newspaper article in which he identified himself as a "White African American," he faced serious repercussions from his peers, including vandalism to his property and being pushed in the hallway by two students, and from the faculty, including the filing of several professionalism complaints against him. He also claims that he endured verbal confrontations with both peers and faculty members as a result of his expressed views on race and ethnicity. He

has proffered no evidence of the alleged student-on-student harassment, much less that any such confrontations were "severe, pervasive and objectively offensive." Nor has he presented any evidence to establish that the school knew about such incidents and acted with deliberate indifference. In response to Defendants' motion pointing to the absence of evidence in support of the claims, Plaintiff has adduced no record of complaining to UMDNJ authorities about confrontations with other students, vandalism or an incident in which he claims he was pushed. In short, the hostile environment claims are purely conclusory, and as a matter of law, the Court may conclude that Plaintiff cannot demonstrate that UMDNJ acted in a "clearly unreasonable" way in response to the alleged, and unsubstantiated, instances of harassment.

Accordingly, the Court will grant Defendants' motion for summary judgment as to Counts Eight and Eleven of the Amended Complaint.

### D.  Claim for Violation of New Jersey Public Policy

In Count Ten of the Amended Complaint, Plaintiff avers that Defendants' allegedly retaliatory and discriminatory acts violated New Jersey public policy. Neither the Amended Complaint nor the motion papers identify the legal authority for the relief Plaintiff seeks for this alleged violation. As best the Court can construe, Plaintiff appears to invoke the private cause of action recognized by the New Jersey Supreme Court in Pierce v. Ortho Pharmaceutical Corp., in which it held that an at-will employee has a cause of action if he was discharged "contrary to a clear mandate of public policy." Pierce v. Ortho. Pharm. Corp., 84 N.J. 58, 72 (1980). To assert a viable claim for common law wrongful discharge, a plaintiff must identify a clear mandate of public policy and allege that the discharge was in violation of that policy. Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 109 (2008). An expression of public policy may be found, the

New Jersey Supreme Court has held, in sources such as "legislation; administrative rules, regulations or decisions; and judicial decisions," though the Court has also cautioned that "not all such sources express a clear mandate of public policy."  Pierce, 84 N.J. at 72.

In the Amended Complaint, Plaintiff asserts that Defendants violated two "clear mandates of public policy" recognized by the State of New Jersey: that students at institutions of higher learning are entitled to academic freedoms and that they may rely on written policies and procedures, including handbooks, while attending school.  Plaintiff gives no indication whatsoever as to the source of these purported mandates, and he relies in his opposition brief solely on the Amended Complaint's conclusory assertions.  To the extent Plaintiff may allege that the NJLAD supplies the clear mandate of public policy, his sole relief for such a violation, if any, would lie in the remedy provided by that statute.  "New Jersey courts and courts interpreting New Jersey law have held that common law claims for wrongful discharge in violation of public policy are preempted when a statutory remedy under the NJLAD exists." Santiago v. City of Vineland, 107 F. Supp. 2d 512, 567 (D.N.J. 2000); see also Lawrence v. Nat'l Westminster Bank of N.J., 98 F.3d 61, 73 (3d Cir. 1996) (affirming the district court's dismissal of a Pierce public policy claim, reasoning that a plaintiff cannot advance a separate common law wrongful discharge claim when the sources of public policy relied on by the plaintiff are coterminous with his statutory claims). "Because of the broad availability of remedies under the LAD, both state and federal courts in New Jersey have frequently held that the LAD bars common law claims based on the same operative facts as underlie the LAD claim." Everson v. JPMorgan Chase Bank, No. 12–7288 (FLW), 2013 U.S. Dist. LEXIS 65309, at *7 (D.N.J. May 8, 2013) (citing various cases).

17

Accordingly, summary judgment will be granted for Defendants on Count Ten of the Amended Complaint.

### III.   CONCLUSION

For the reasons discussed, Defendants' motion for summary judgment will be granted in its entirety, and the case will be closed.  An appropriate order will be filed.

s/ Stanley R. Chesler<br>
STANLEY R. CHESLER<br>
United States District Judge

Dated:  June 13, 2014